CONCEPCIÓN LOZADA OCASIO, Appellant, *v.* THE REGISTRAR OF PROPERTY OF CAGUAS, SECTION I, LUIS MOJICA SANDOZ, Respondent.

No. O-70-161.     Decided December 7, 1970.

*Gloria M. Mimoso Raspaldo* for appellant. The respondent Registrar appeared by brief.

MR. JUSTICE RIGAU delivered the opinion of the Court.

Spouses Lozada Rivera, hereinafter referred to as the Lozadas, and spouses Contreras Lozada, hereinafter referred to as the Contreras, executed a public deed in which the following was stated.

The Lozadas are the owners of an urban lot of 209.60 square meters situated in Caguas, Puerto Rico, and of a one-story reinforced concrete and concrete-block house situated on said lot. By mutual agreement and upon payment of $500 the Lozadas agreed and consented that the Contreras

build a house superimposed on the aforementioned residence, which house is actually a second floor, and which is described in detail in the deed. By the terms of said description we understand that this is a house constructed for dwelling purposes. The Contreras state that the value of the second floor constructed is $10,000. The Lozadas expressly consent that said second floor be recorded in the Registry of Property under the name of its owners, the Contreras.

The Lozadas also set forth that in consideration of the additional payment of $200 which they received from the Contreras, they grant the latter the right to have access to the staircase which leads to the second floor through the carport of their house, that is, through the carport of the first floor. They also granted the Contreras permission to place their automobile in said carport.

The Registrar of Property of the First Section of Caguas, Puerto Rico, Luis Mojica Sandoz, refused to record the instrument by a note of refusal which copied *verbatim* reads as follows:

"Record of this document is hereby denied since we understand that it deals with the establishment of a property divided by floors, that is to say, horizontal property, and that, therefore, it is imperative that the building be submitted to the regime established by the Horizontal Property Act approved June 25, 1958, since, according to § 47 of the latter, the only provisions which govern the matter are those contained in said Act after the effective date of the latter. The aforementioned Act has not been complied with, especially as to what concerns the description of the general common elements of the building, the expression of the purpose to which each floor is destined, and everything relative to the administration of the property (§ 22). Copy of the bylaws are not inserted either in the enabling deed (§§ 36–37), nor the plans required (§ 24), a cautionary notice for the legal term of 120 days being entered instead in favor of Ángel Manuel Contreras and his wife Luz María Lozada Rivera, on the back of folio 245 of volume 215 of Caguas, property 6464, notice 'A'."

On their part appellants maintain that the provisions of the Horizontal Property Act are only applicable to buildings whose owners expressly declare their desire to submit the same to that regime and that they have not done so, nor desire to do so.

Notice, the appearing parties point out, that it is not requested in the deed that the second floor be recorded as a separate property, but rather what is requested is that it be recorded as part of the original property. Therefore, they point out, § 47 of the Horizontal Property Act is not applicable since the record of the second floor is not being requested under the terms of § 330 of the Civil Code nor under the terms of the Horizontal Property Act.

The registrar reasons that since the provisions of § 330 of the Civil Code, 31 L.P.R.A. § 1275, are not available for appellants by express mandate of § 47 of the Horizontal Property Act, 31 L.P.R.A. § 1293k, and this being, in his opinion, a case of horizontal property, the deed lacks the requirements that it should include, which he mentions in his note of refusal.

Should the Registrar be correct appellants would have to consent to one of the following three possible situations: (1) to submit, together with the owners of the first floor, to the horizontal property regime, which could be onerous to both parties because of the modest value of the property; (2) to become co-owners pro indiviso, in the proportion justified by their investment in all the real property, a generally uncomfortable situation; and (3) to confront themselves with the sections of the Civil Code which govern accession with respect to real property, a very undesirable situation also. From an examination of the deed it appears with crystal clearness that the parties did not have the intention of placing themselves in any of the three aforementioned situations.

After considering the problem in the light of our civil law and of the best contemporaneous currents of thought on the same, we believe there is a fourth and fairer solution. This case constitutes one of those in which the courts must face one of the many intricate problems raised, in its inexhaustible abundance, by the difficult but exalting task of applying the Law to real life.

■ The law having expressed it so, there is no doubt that submitting a real property to the horizontal property regime is a voluntary act of the owner or owners of the same. Section 2 of the Horizontal Property Act, Act No. 104 of June 25, 1958; 31 L.P.R.A. § 1291. There is no doubt either that if it is desired to do so the formalities required by the Act must be complied with. 31 L.P.R.A. § 1292 *et seq.*

Before our positive law contained the Horizontal Property Act the matter was governed by § 330 of the Civil Code, 31 L.P.R.A. § 1275, corresponding to § 396 of the Spanish Civil Code, which was derived, in turn, from § 664 of the Code of Napoleon. Our § 330, as amended, constituted in effect a limited horizontal property act. It concerns floors of a building possessed by different owners and the common elements of the building "such as land, foundations, basements, walls, moats, yards, wells, stairs, elevators. . ." etc.,; it provides as to the maintenance expenses of the common elements and as to other particulars characteristic of the horizontal property regime.

When by the end of the 18th century and the beginning of the 19th century the task of the European codification commenced, by reason that the horizontal property had not attained the boom it has at the present time, the matter was treated very superficially in the codes. The Spanish Civil Code, although approved much later, in 1889, followed said trend. Proof thereof are the original texts of Spanish § 396 and the Puerto Rican § 330, which are identical and are composed of four brief paragraphs. In the course of time such

a sparing regulation was insufficient and it was necessary to elaborate said sections. The amendment of the Spanish § 396 was produced by the Act of October 26, 1939, and that of the Puerto Rican § 330 by Act No. 421 of May 13, 1951, which once more followed closely the new Spanish text.

Although the amendment, that of 1939 in Spain and that of 1951 in Puerto Rico, of said sections of the Civil Code introduced desirable changes, it did not gather adequately the principles which characterize the institution of the horizontal property, nor make it object of a special and detailed regulation as had already occurred in other countries, such as Belgium, France, Italy, Brazil, Bulgaria and Chile. The problems which in relation to the imperfect regulation of this matter existed, although palliated for the time being by the aforementioned amendment, continued to be aggravated. The urban development everywhere clamored for attention to the problem.[1]

Taking into consideration that need our Legislature considered and approved the Act which became our Horizontal Property Act now in force, which took as a model the Cuban Act No. 407 of September 18, 1952. Said Cuban Act of 1952 was already acknowledged as an excellent piece of legislation. Furthermore, its adoption in Puerto Rico was propitious, since the Civil Code and the Mortgage Law of Cuba were practically identical to those of Puerto Rico, and as it is well known, they have a common origin.[2] In Spain § 396 as

---

[1] *Castle Enterprises* v. *Registrar*, 87 P.R.R. 738 (1963); Fernández Martín-Granizo, *La Ley de la Propiedad Horizontal en el Derecho Español* 92–93, Madrid (1962); Batlle-Vázquez, *La Propiedad de Casas por Pisos* 37–41, 6th rev. ed. (1970); 1 Ferrer and Stecher, Law of Condominium § 43 (1967).

[2] 10-3 *Diario de Sesiones de la Asamblea Legislativa de Puerto Rico* 1574, 1649 and Vol. 10-4 at 2004, both of the year 1958; Aguirre, Agustín, *Tres Conferencias sobre Propiedad Horizontal en Torno a la Ley de Puerto Rico* 19, Madrid (1963). These conferences were also published in 36 *Revista Crítica de Derecho Inmobiliario* 305–344 and 504–533 (1963).

amended in the year 1939 was already insufficient, and there the Horizontal Property Act of July 21, 1960, was approved. In that country the corresponding modifications to the Mortgage Law were also made.

The Horizontal Property Act being, then, a more complete and superior legislation than the regulation contained in § 330 of the Civil Code, the lawmaker provided in § 47 of the new Act that the provisions of § 330 of the Code and those of Act No. 422 of May 13, 1951, amending Art. 8 of the Mortgage Law, would only apply to those buildings whose floors were already constructed by virtue of those legal provisions on the effective date of the Horizontal Property Act. 31 L.P.R.A. § 1293k. In other words, the lawmaker provided that at the present time whoever wants to submit a building to the horizontal property regime must do it through Act No. 104 of June 25, 1958; 31 L.P.R.A. § 1291 *et seq.*

But the foregoing cannot be flaunted against appellants since they, and the other appearing parties in the aforementioned deed, do not seek to record a real right under § 330 of the Code nor under the Horizontal Property Act. The Lozadas certainly have not agreed that they desire to submit their property to the horizontal property regime, nor that they desire that the lot on which the house is located, its foundations, main walls, yard and garden become elements common to the real property. They have only agreed to permit that the Contreras build a second floor on top of and to grant them access to said second floor passing through the carport of their house. They have also agreed that the Contreras place their automobile in said carport.

Since our code of laws follows the doctrine of the *numerus apertus*, it must be evident that § 47 of the aforecited Act No. 104 does not preclude the appellants from recording their indubitable real right. What said section forbids, as we already said, is to resort to the provisions of § 330 of the

Civil Code. But as we have already pointed out also, they are not interested in doing so.

■ The situation is the following. The Lozadas, owners of the lot and of the first floor, have granted, and the Contreras have acquired a surface right (on top of the house of the Lozadas) and upon building thereon they have acquired a property right in the house they constructed thereon. Let us look at the juridical situation somewhat closer.

Nothing is more appropriate to serve as introduction to the study which follows than the following paragraphs taken from the introduction which Ventura-Traveset wrote for his book,[3] and another taken from Castán. The words of Ventura-Traveset referred to are the following:

"Among the multiple aspects raised by the housing problem, one of those occupying the attention of the jurists, is the regulation of the juridical relations established between the different persons who contribute each one, one of the elements necessary for the building or construction of dwellings or premises. . . .

"[T]he necessity of increasing the solutions to the great housing problem, makes necessary what could be called utilization of vacant spaces existing in the projection of buildings already constructed, and whose cubic parcelling will originate new floors and premises.

"All this gives rise to the appearance, in the juridical sphere more frequently than it used to occur some time ago, of a gamut of contracts executed between the owner of a lot who lacks the economic means to build or who does not desire to become a constructor, and another person who has the means or is a building technician, and on the other hand, lacks the capital to acquire a lot, which at the present time amounts to a rather high price.

"Other times it is the owner of a more or less old building, whose walls offer sufficient strength to support the construction of several floors, with the practical utilization of an aereal space unused before, contributed by the former, in order that on top of said building new floors and premises might be built by the

---

[3] *Derecho de Edificación sobre Finca Ajena y la Propiedad Horizontal* 7, Barcelona (1963).

person who has the capital and the necessary technical capacity to do so."

The paragraph taken from 2-II Castán, *Derecho Civil Español, Común y Foral* 320, 10th ed. (1965) is the following:

"As Roca Sastre properly states, 'the steady growth of population in many important cities imposes, at the present time, the necessity of utilizing to the proper maximum the area on top and underneath the buildings already existing by increasing the number of floors, either by constructing to higher altitudes, or by constructing underground, insofar as the municipal ordinances permit it.' Well then, this need has imposed the utilization of agreements with real transcendency by which the right to construct on top or underneath the building, new floors or constructions is granted *to a person other than the owner of the building*. (Italics ours.)

Puig Peña gives us a traditional definition of the surface right. In his I-III *Tratado de Derecho Civil Español* 475 (not dated), he states that by surface right may be understood "that right of real nature by virtue of which a person (grantor) grants to another (superficiary) the right to build on the surface of his property, buildings or erections of which the person who builds becomes title holder under certain and specific conditions."

■ Writing more recently Roca Sastre has stated the following: "According to the modern concept, the surface right is the real right to have or maintain, temporarily or indefinitely, on another person's land or *real property* a building or erection as *separate property*, obtained by the exercise of the accessory right to build or erect or by means of an act of acquisition of the preexistent building or erection." (Italics ours.) *"Ensayo sobre el Derecho de Superficie"* published in *Revista Crítica de Derecho Inmobiliario*, extraordinary edition, Commemorating the First Centennial of the Spanish Mortgage Law of 1861, Nos. 392–393 (January–February 1961) p. 7.

The surface right has its origin in remote times. It is not necessary to make a recital of its history herein since the interested person may find it in the sources which we shall mention below. For a historic approach see II González Martínez, *Estudios de Derecho Hipotecario y Civil* 221 *et seq.* (1948). For a modern treatment see Roca Sastre, *"Ensayo sobre el Derecho de Superficie,"* in *Revista Crítica de Derecho Inmobiliario, op. cit.* In the same sense see III Puig Brutau, *Fundamentos de Derecho Civil* 503–513 (1953). For an excellent synthesis see Castán, 2-II *Derecho Civil Español, Común y Foral* 302–321, 10th rev. ed. (1965). Castán, with his customary erudition, cites a score of other works. You can see also I–III Puig Peña, *Tratado de Derecho Civil Español* 475–484 (not dated).

In view of the foregoing we shall limit ourselves to cite some passages which we consider pertinent.

The evolution of the surface right was tedious because of the rigidity of the ancient Roman Rule *superficies solo cedit.* Roca Sastre explains that originally the surface right had the nature of a personal or obligatory right. Later on it was protected by interdicts until in the post-classic Roman Law it was considered as a real and transmissible right. But the surface right in the Roman Law was only a *ius in re aliena* on the building constructed by the superficiary, since it only acknowledged it as a right to construct and to enjoy the thing constructed.

In the *corpus* the surface right only attributes the power to benefit from the building constructed by the superficiary, but without ever implying the juridic figure of separate property, that is, the superficiary ownership of the building—as the surface right is conceived at the present time.

It was so because the Roman Law did not recognize the figure of the ownership of the building as separate ownership from that of the soil, simply because accession always operated, principle which in the matter of personal property

incorporated to real property always operated without exceptions. This concept, stated in the classic rule *superficies solo cedit* made it difficult to acknowledge ownership of the thing constructed to the person who constructed on the land of another. In the evolution and development which the civil law inevitably had—and which it continues to have—the germanic law contributed the inverse idea of giving more value to the building than to the soil and the ownership of the building or erection separate from the land was admitted.

And thus, as Roca Sastre points out, "In the second half of the era of the *ius commune* the rigidity of the classic Roman rule *superficies solo cedit* becomes weaker and the surface right likewise begins to detach itself from the emphyteusis and to evolve toward the modern concept of the surface right conceived as *separate property.*" *Op. cit.* at 11.

Puig Brutau, *op. cit.*, after making a broad recital of the evolution of the real right under consideration, concludes:

"That is to say in modern times the surface right is conceived as an effective derogation of the rule that whatever is constructed yields as accession or for the benefit of the owner of the soil (*superficies solo cedit*). Now it is considered possible that a legal person may have the ownership of the soil and that another may have the ownership of the building erected on the same."

At the time of the codification, the European Civil Codes admitted, although diffidently, the surface right. The new Italian Civil Code (1942), acknowledging the reality, has incorporated to its text an ample regulation on the surface right in §§ 952 to 956. The text of said code is found in I Messineo, *Derecho Civil y Comercial* 133 *et seq.*, Buenos Aires (1954).

J. W. Jones states that the case of the *superficies* is extremely interesting as a result of its revival in the 20th century, after a period of obsolescence in the 19th century, but said author recognizes that the modern civil law has moved to reinvigorate the right to surface property, con-

templating, especially, the contemporaneous urban needs.— Historical Introduction to the Theory of Law 269, Oxford (1940). There is a reprint of this work in the year 1969. In this new publication the aforementioned page is the same.

Puig Brutau states, *op. cit.*, "we must depart, then, from the reality that the real surface right is a juridic figure admitted in our law."

Puig Peña, after discussing the evolution of this right and the different opinion expressed on this matter, chooses the one which to him

"[S]eems the most accurate, which is being received with greater acclamation and which definitively represents the term of doctrinal and legal evolution experimented by the superficiary phenomenon, maintains an integral point of view in the sense of understanding that the superficies constitutes a real right in the soil and at the same time a superficiary or separate ownership. . . ." And he adds: "The owner of the soil waives by this concession the law of accession and empowers the third party (whether or not there exists the payment of a rental) to construct when he deems it convenient.

"The relation between the superficiary and the construction erected determines the surface ownership, since as the construction is going on by virtue of the concession *ad aedificandum,* the separate ownership in favor of the superficiary is arising."— *Op. cit.* at 477.

Castán, after acknowledging that the codes of the last century (of which ours is one) of individualistic nature saw with prejudice the divided ownership, and that they scarcely regulated the surface right, explains that during the 20th century a legislative and doctrinal reaction has been initiated in favor of this right, which is nowadays considered an excellent instrument to attend to some juridical needs which cannot be satisfied by other means, and, mainly, to assist in the solution of the housing problem, so critical in our times.[4] Said

---

[4] Writing on the "present tonic of the property right" Castán explains that the modern orientation of said right has, as an outstanding

author adds:

"In general, the modern doctrine marks a positive advancement toward the concept of surface right as a form of ownership. The principle of *superficies solo cedit,* so fundamental in the Roman Law, having been discredited, and the admissibility of a property divided by horizontal plans having been acknowledged by the commentators and the modern legislations, the position adopted by the Italian Code of 1942, in which . . . surface is an ownership like any other, is logical."

■ As to the surface right Roca Sastre explains that it has the following fundamental characteristics: (1) it is a real right; (2) it has as its object to have or maintain, on land or real property belonging to another person, a building or erection as separate property; (3) it makes possible the separate ownership of the building with respect to the soil where it is located; (4) it may be of temporary or perpetual duration; and (5) it may refer to buildings on the soil or to buildings underneath it.—*Op. cit.* at 16 *et seq.*

Referring to the theory which explains the essence of the surface right and of the right to superficiary property Roca Sastre states:

"One thing is the *surface right,* which is the expression of that juridical relation which permits the superficiary *to have or maintain* on the land of another person the ownership of the building; and another is the *ownership of said building,* whose existence makes possible the existence of the surface right, and that, for that reason, it is called *superficiary property. . . ."*

"The *surface right* is the *juridical support* of the *superficiary property. . . ."* (Italics ours.)—*Op. cit.* at 19.

---

mark "the rectification of the individualistic sense attained by the property right in the traditional theory, which, elaborated by the Romanists and by the so-called natural law school, passed to the modern codes." He adds: "The individualistic concept of ownership as an unlimited right in the thing is entirely discredited nowadays. . . . The problem of ownership, as generally that of all the law, is a problem having limits. It rests on the determination of temperaments to be assigned to the concept of the ownership to prevent that the latter constitute an obstruction and a hateful restriction to the rights of the civil partnership." II-I Castán, *op. cit.* at 99 *et seq.,* 10th rev. ed. (1964).

■ The same author points out that "the surface right may fall on top or underneath the soil of another person, and even on top of the *building* already constructed as well as, strictly speaking, under the building constructed underground."—*Op. cit.* at 41.

The commentators—Roca Sastre, Castán, Puig Peña, etc. —systematically discuss the duties and rights of the *dominus soli* (the grantor) and the superficiary.

Our Civil Code mentions the surface right in § 1503, 31 L.P.R.A. § 4178, as a consequence of the fact that its predecessor, the Spanish Civil Code of 1889, also mentions it. But as Roca Sastre points out, prior to the Code, the Mortgage Law of 1861, with a vision broader than the former contemplated the existence of the surface right as an autonomous right separate from the emphyteusis, and thus said law, in its § 107(5) included the surface right among the property which may be mortgaged "provided the rights of others in the ownership be protected."—*Op. cit.* at 12.

Likewise our Mortgage Law (1893) also in Art. 107(5) expressly provides that the surface right may be mortgaged. 30 L.P.R.A. § 203(5). In view of the clear real nature of the rights to surface and superficiary property, there is no doubt that they are recordable in Puerto Rico, as in Spain. Our aforecited Mortgage Law in its Art. 2, upon enumerating the rights which may be recorded, after mentioning the most well-known rights, adds "or any other real rights." 30 L.P.R.A. § 2 (second). See also, in the Mortgage Regulations, Arts. 24 and 27. 30 L.P.R.A. §§ 854 and 857. As we have already pointed out, our code of laws follows the doctrine or the *numerus apertus*. Like doctrine is followed by the proposed Mortgage Code submitted by the Governor to the Legislature in its ordinary session of 1967 (House Bill 782 of March 9, 1967). In its Art. 120 said bill provides that deeds containing acts and contracts transferring, constituting or extinguishing the ownership of real property or of property rights and any

others which modify any of the rights of ownership in real property or those inherent to said property rights, *although they do not have their own name,* shall be recorded.

Acknowledging the restraint with which the Spanish Civil Code and, consequently, ours, mentions the surface right, but also acknowledging its condition of property right, Castán states:

"It is not specifically regulated in our Civil Code, but paragraph 5 of article 107 of the Mortgage Law gives us a basis to attribute to it a category of property right, in considering it mortgageable."—II-I, *op. cit.* at 44, 10th rev. ed. (1964).

█ In the case at bar the parties appearing in the deed have not agreed, as we have already stated, to submit a real property to the horizontal property regime. This is not either an emphyteutic annuity since the contract has not fixed any annual income. Said annual income is an essential element for the execution of the emphyteutic annuities. Section 1521 of the Civil Code; 31 L.P.R.A. § 4212. In the case at bar the superficiaries acquired, by the payment of a certain sum of money, a surface right in the grantors' property and upon building on top of said surface they have acquired a property right in what they constructed thereon. As we have seen, those are real and recordable rights.

In view of the foregoing the Registrar's note appealed from will be reversed and he will be ordered to record the document presented to him by the appellants.[5]

Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra did not participate herein. Mr. Justice Pérez Pimentel concurs in the result.

---

[5] In cases of buildings of several floors belonging to different persons and whose buildings have common elements such as lobbies, corridors, elevators, basements, yards, garbage incinerators, etc., the horizontal property regime is the one indicated because of the problems of administration and of maintenance which the latter present.